TITAN INDEMNITY COMPANY, United States Fidelity & Guaranty Company, St. Paul Fire & Marine Insurance Company, and St. Paul Travelers Companies, Inc., Appellants,

v.

OLD SOUTH INSURANCE GROUP, INC. and Carroll Hood, Appellees.

Nos. 04–05–00826–CV, 04–05–00827–CV.

Court of Appeals of Texas, San Antonio.

Dec. 27, 2006.

Rehearing Overruled Feb. 1, 2007.

Charles G. Copeland, Rebecca Blunden, Copeland Cook Taylor & Bush, P.A., Ridgeland, Renee Forinash McElhaney, Cox Smith Matthews Incorporated, San Antonio, for appellants.

Frank Herrera, Jr., Laura E. Gutierrez Tamez, Law Office of Frank Herrera, Inc., San Antonio, Christopher B. McDaniel, Eugene M. Harlow, Hortman Harlow Martindale Bassi Robinson & McDaniel, P.L.L.C., Laurel, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by CATHERINE STONE, Justice.

This is an appeal of two default judgments which were granted after the de-

fendants failed to answer two of three lawsuits filed against them. Defendants' conduct which led to the failure to answer the lawsuits was admittedly negligent, and was further described by experts as arrogant. This court must determine whether the failure to answer the lawsuits was intentional or the result of conscious indifference. We hold that the failure to answer was indeed negligent and a mistake, but was not intentional or the result of conscious indifference. Accordingly, we reverse the judgments and remand to the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

Titan Indemnity Company, United States Fidelity and Guaranty Company, St. Paul Fire and Marine Insurance Company, and St. Paul Travelers (collectively "St. Paul") appeal two default judgments granted in favor of Old South Insurance Group, Inc. and Carroll V. Hood. On appeal St. Paul contends the trial court abused its discretion in denying a motion for new trial to set aside both default judgments because St. Paul met the test set forth in *Craddock v. Sunshine Bus Lines, Inc.*, 134 Tex. 388, 133 S.W.2d 124 (1939). St. Paul also challenges the factual sufficiency of the evidence and argues the Hood default judgment awards damages for a cause of action that is not recognized by Texas law and for causes of action Hood did not plead.

The factual history of this case is set forth in an opinion issued by the Mississippi Supreme Court arising from prior litigation in Mississippi between the same parties regarding the same subject matter. *See Titan Indem. Co. v. Hood*, 895 So.2d 138 (Miss.2004). To briefly summarize, Carroll Hood and Jerald Delaney formed HICO to market Titan public entity insurance in Mississippi. HICO marketed the insurance pursuant to a Representative Agreement that contained a forum selection clause providing for exclusive personal jurisdiction and venue in Bexar County, Texas. Delaney and a few partners later formed Old South, which served as one of the insurance agencies through a producer's agreement between Titan and Old South.

Titan was taken over in a series of conveyances and mergers. In June of 1998, Delaney resigned from HICO and entered negotiations for Old South to market public entity insurance for Zurich, St. Paul's competitor. When St. Paul learned of the resignation, it terminated Delaney's authority to sell St. Paul/Titan public entity insurance. In August of 1998, Old South entered into an agreement with Zurich, but also sought to retain its ability to approach the public entities to which it previously sold St. Paul/Titan insurance.

In October of 1999, a lawsuit was filed in Mississippi in which HICO, Hood, Old South, and St. Paul were parties. Various causes of action were asserted against St. Paul for actions taken to eliminate Old South, Hood, and HICO from marketing and selling Titan/St. Paul public entity insurance.[1] The case went to trial and the jury rendered a verdict in favor of: (1) HICO for $1.3 million in compensatory damages and $75 million in punitive damages; (2) Hood based on an emotional distress claim for $1.2 million; and (3) Old South for $310,000 in compensatory damages and $5 million in punitive damages. The Mississippi Supreme Court reversed the trial court's judgment, holding that the forum selection clause in the Representa-

1. Although HICO and Hood initially asserted claims against Old South, the claims between these parties were settled before the Missis-sippi trial and the parties were aligned during trial.

tive Agreement was binding and enforceable. The Mississippi Supreme Court noted, however, that it had no power to transfer the litigation to Texas.

The Mississippi Supreme Court issued its opinion on November 22, 2004, and denied a motion for rehearing on March 24, 2005. After the Mississippi Supreme Court's opinion, the parties continued to litigate the recovery of the costs of the appeal by St. Paul. Based on a savings statute in Texas,[2] Hood, Old South, and HICO believed that they were required to file their petitions in Texas within sixty days from the date the Mississippi Supreme Court's decision was final.[3] Accordingly, HICO, Hood, and Old South each filed individual petitions in district court in Bexar County, Texas on May 20, 2005.

On May 24, 2005, Peter Schwartz, then general counsel for St. Paul, received an e-mail with the petition filed in Texas by HICO attached. Within five minutes, Schwartz also was e-mailed the petitions filed in Texas by Hood and Old South. The subject lines on the e-mails referred to the different plaintiffs' names. Schwartz stated that in his mind, there was only one lawsuit, as there had been only one lawsuit in Mississippi for all of the plaintiffs' claims. He further stated that he believed the subsequent e-mails were copies of the same petition. He was of the same mind set when he received additional copies of the petitions a few days later.

The petition filed by HICO was forwarded to outside counsel and the lawsuit was answered and removed to federal court. When St. Paul failed to file an answer in the Hood and Old South suits, Hood and Old South took default judgments against St. Paul. The Hood default judgment awarded Hood $2,800,000 in past and future compensatory damages "for intentional and/or negligent infliction of emotional distress," $75,000,000 in punitive damages against all of the St. Paul entities jointly and severally, interest, and attorneys' fees, for a total judgment of $80,116,420.68. The Old South default judgment awarded Old South $234,293 in past economic damages, $316,338 in future economic damages, $5,000,000 in punitive damages against the St. Paul entities jointly and severally, interest, and attorneys' fees, for a total judgment of $6,770,000.18.

St. Paul filed a motion for new trial and extensive discovery ensued. The trial court denied the motion after a two-day hearing based on its finding that the defendants' "failure to answer and appear was intentional and the result of conscious indifference...." Hood remitted the punitive damages and attorney's fees awards during the course of the hearing.[4]

2. Section 16.064 of the Texas Civil Practice and Remedies Code provides:

(a) The period between the date of filing an action in a trial court and the date of a second filing of the same action in a different court suspends the running of the applicable statute of limitations for the period if:
(1) because of lack of jurisdiction in the trial court where the action was first filed, the action is dismissed or the judgment is set aside or annulled in a direct proceeding; and
(2) not later than the 60th day after the date the dismissal or other disposition becomes final, the action is commenced in a court of proper jurisdiction.

TEX. CIV. PRAC. & REM.CODE ANN. § 16.064 (Vernon 1997).

3. There is some question about whether the sixty-day savings provision was applicable in this case because St. Paul had waived any limitations issues in a document filed in the Mississippi litigation as to claims that were then pending in Mississippi.

4. It appears that the remittitur may have been based on the fact that the punitive damages were assessed against several defendants

MOTION FOR NEW TRIAL

It is a basic tenet of jurisprudence that the law abhors a default because equity is rarely served by a default. *Benefit Planners, L.L.P. v. RenCare, Ltd.,* 81 S.W.3d 855, 857–58 (Tex.App.-San Antonio 2002, pet. denied). More than sixty years ago, the Texas Supreme Court enunciated the standard that courts follow today in examining no answer default judgments. *San Antonio Water Sys. v. McKnight,* No. 04–02–00239–CV, 2003 WL 141047, at *1 (Tex.App.-San Antonio Jan. 22, 2003, no pet.). A default judgment should be set aside if the defendant proves the following three familiar elements set forth in *Craddock:* (1) the failure of the defendant to answer was not intentional or the result of conscious indifference, but was due to a mistake or accident; (2) the motion for new trial sets up a meritorious defense; and (3) a new trial would cause neither delay nor undue prejudice. *Craddock v. Sunshine Bus Lines, Inc.,* 134 Tex. 388, 133 S.W.2d at 126; *see also Tex. Sting, Ltd. v. R.B. Foods, Inc.,* 82 S.W.3d 644, 650 (Tex.App.-San Antonio 2002, pet. denied). The historical trend in default judgment cases is toward the liberal grant of new trials. *Tex. Sting, Ltd.,* 82 S.W.3d at 650; *Norton v. Martinez,* 935 S.W.2d 898, 901 (Tex.App.-San Antonio 1996, no writ). Thus, where the elements of the *Craddock* test are satisfied, a trial court abuses its discretion in denying a motion for new trial. *Tex. Sting, Ltd.,* 82 S.W.3d at 650.

**A. Conscious Indifference**

Conscious indifference must amount to more than mere negligence to satisfy the *Craddock* rule. *Young v. Kirsch,* 814 S.W.2d 77, 81 (Tex.App.-San Antonio 1991, no writ). The conscious indifference standard requires a showing

that the defendant knew it was sued but did not care. *Fidelity & Guar. Ins. Co. v. Drewery Const. Co.,* 186 S.W.3d 571, 575–76 (Tex.2006). Another court has defined conscious indifference to mean that the defendant was " 'clearly aware of the situation and acted contrary to what such awareness dictated.' " *Young,* 814 S.W.2d at 81 (quoting *Guardsman Life Ins. Co. v. Andrade,* 745 S.W.2d 404, 405 (Tex.App.-Houston [1st Dist.] 1987, writ denied)).

Conscious indifference is generally defined as the failure to take some action that would seem obvious to a reasonable person under similar circumstances. *Tex. Sting, Ltd.,* 82 S.W.3d at 650; *Norton,* 935 S.W.2d at 901. The courts have applied this prong of the *Craddock* test liberally, considering each case on an ad hoc basis. *Tex. Sting, Ltd.,* 82 S.W.3d at 650; *Norton,* 935 S.W.2d at 901. The controlling fact under the first prong's analysis is the absence of a purposeful or bad faith failure to answer. *Tex. Sting, Ltd.,* 82 S.W.3d at 650; *Norton,* 935 S.W.2d at 901. The defaulting party must provide some excuse, but not necessarily a good excuse, for failing to answer in a timely manner. *Fidelity,* 186 S.W.3d at 576.

We look to the knowledge and acts of the defaulting party to determine whether the failure to appear was due to intentional disregard or conscious indifference. *Walker v. Gutierrez,* 111 S.W.3d 56, 64 (Tex.2003); *Tex. Sting, Ltd.,* 82 S.W.3d at 650. When a defendant relies on an agent to file an answer, he must demonstrate that both he and his agent were free of conscious indifference. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 83 (Tex.1992). If the factual assertions in the defaulting party's new trial affidavits are uncontroverted, the defaulting party satis-

---

jointly and severally which was argued to be

impermissible.

fies its burden if it sets forth facts that, if true, negate intent or conscious indifference. *Tex. Sting, Ltd.*, 82 S.W.3d at 650–51; *Norton*, 935 S.W.2d at 901–02. In determining whether the defaulting party's assertions are controverted, the court looks to all the evidence in the record. *Tex. Sting, Ltd.*, 82 S.W.3d at 651; *Norton*, 935 S.W.2d at 902.

In *Fidelity & Guaranty Insurance Co. v. Drewery Construction Co.,* Fidelity attached four affidavits to its motion for new trial establishing that its registered agent for service would, in the ordinary course of business, electronically scan documents served on the agent and forward them to a Fidelity affiliate. 186 S.W.3d at 574–75. This did not happen in the case before the court. *Id.* at 575. As a backup procedure, the agent ordinarily would forward the service documents themselves to the affiliate, where they were compared to the electronic scan and discarded after 90 days. *Id.* Because 90 days passed before Fidelity learned of the default, neither the agent nor Fidelity could verify if the papers were actually forwarded because all records that were received during the time period had been discarded in the ordinary course of business. *Id.* The agent stated Fidelity received the papers, but the Fidelity affiliate said they were not received. *Id.*

The trial court denied the motion for new trial filed by Fidelity, and the court of appeals affirmed on the basis that Fidelity's affidavits did not explain what happened to the service documents. *Id.* The supreme court reversed, asserting:

> We disagree that Fidelity's four affidavits were general or conclusory. To the contrary, they detail the procedures for handling service papers in general and what is known about Drewery's papers in particular. In the case of the electronic records, they explain precisely where the breakdown occurred-at data entry by CSC.

*Id.* The court held, "[t]he affidavits here show neither intent nor indifference. Instead, they detail Fidelity's efforts to establish a system that would avoid precisely what happened." *Id.* at 576.

■ In this case, Schwartz explained that the breakdown occurred with him. Schwartz explained that because only one petition was filed in Mississippi, he had tunnel vision and believed only one petition was filed in Texas. It was common for him to receive multiple and repetitive copies of petitions because they were served various ways and on various St. Paul entities, thus the multiple copies of the e-mails did not raise any questions in his mind that more than one lawsuit was involved. Schwartz spoke with the general counsel for Titan, Assunta Rossi, because St. Paul was required to indemnify Titan in regard to the lawsuit, and Schwartz agreed that St. Paul would defend Titan as it had in Mississippi. Schwartz stated that the conversation was brief, he did not recall Rossi referring to petitions in the plural, and he declined her offer to send him what she had because he already had copies. Schwartz explained that when he subsequently received two additional e-mails several days later forwarding the petition with the subject line referring to Hood v. Titan, he still believed it was additional copies of the same petition because that was what he was locked into thinking. Schwartz stated that St. Paul was ready to go to trial in the event a new trial was granted setting aside the default, and St. Paul would pay all costs relating to the default judgment.

Schwartz stated that he was unaware when he received the HICO petition that St. Paul was engaged in on-going settlement negotiations with Old South, but he was aware that St. Paul was attempting to

recover the costs of the Mississippi litigation from HICO, Hood, and Old South. Schwartz acknowledged that each petition had a different style and cause number, but he stated he never opened the e-mails or attachments to compare them at the time he received them. Schwartz explained that he did not expect HICO, Hood, and Old South to file separately when they were co-plaintiffs in one lawsuit in Mississippi. Schwartz stated that he retained outside counsel within 24 hours of receiving the HICO petition, and he does not have a tickler system to follow up on outside counsel. Schwartz's testimony reveals negligence at best, but it does not establish he knew there were three different lawsuits and that he simply did not care and intentionally failed to answer two of the lawsuits. *See In re R.R. & S.J.S.*, 209 S.W.3d 112, 115 (Tex.2006) (citing *Fidelity*, 186 S.W.3d at 576).

The affidavits and depositions of other attorneys involved in the case indicate the attorneys believed that Hood and Old South elected not to file in Texas due to the strength of the defenses St. Paul had against their claims. One attorney used the phrase that they "got smart," while another used the phrase "threw in the towel." The attorneys also testified that pursuant to ethical standards and the Texas Lawyer's Creed, they were surprised to learn of the defaults because they were working with the same counsel in the HICO case, and they thought that the attorneys would have asked why they had not filed an answer in the other cases. *See Tex. Sting, Ltd.*, 82 S.W.3d at 647 n. 3 (noting counsel's failure to contact counsel for opposing party before taking default despite ongoing negotiations between the two attorneys and despite the Lawyer's Creed provision that a lawyer "will not take advantage by causing any default or dismissal to be rendered when [the lawyer] know[s] the identity of an opposing coun-

sel, without first inquiring about that counsel's intention to proceed.").

Hood and Old South question the credibility of the notion that they would "get smart" or "throw in the towel" in light of the ongoing litigation in Mississippi over costs and considering the large sums of damages awarded by the Mississippi jury. Old South further counters that the notion is even more strained given the on-going settlement negotiations between Old South and St. Paul. Additionally, Hood and Old South presented two experts at the motion for new trial hearing who stated that a reasonable person would have inquired about the status of Hood and Old South upon receiving the HICO petition. The experts discounted the belief that Hood and Old South would "give up" and aptly attributed it to arrogance on St. Paul's behalf. The experts were also critical of Titan's reliance on Schwartz and Rossi's failure to follow up after their initial phone conversation.

St. Paul responds by citing this court's opinion in *National Rigging, Inc. v. City of San Antonio*, 657 S.W.2d 171 (Tex.App.-San Antonio 1983, writ ref'd n.r.e.). In *National Rigging*, the City of San Antonio sued Mashburn Trucking, Inc. and National Rigging, Inc. for various causes of action. *Id.* at 172. Identical petitions against both defendants were served on the president, who was the president of both defendants. *Id.* The president forwarded only one petition to the carrier, and a default was taken against the other corporate defendant. *Id.* In support of the corporate defendant's motion for new trial, the president stated that he put the other petition in his desk believing it was a duplicate that he could keep for his records. *Id.* The trial court denied the motion for new trial, and this court reversed. *Id.* at 173. Although this court noted that the excuse given by the president was

"certainly very slight," it did not indicate an intention to suffer judgment to go by default. *Id.* So it is in this case. Schwartz offered his excuse that he had tunnel vision or a mind set that only one suit was filed and that the additional petitions forwarded to him were merely duplicates. He identified the breakdown in the system designed to ensure lawsuits were answered—it occurred when his tunnel vision stopped him from opening the multiple e-mails and attachments. This excuse, though slight, reveals negligence and perhaps arrogance, but it does not indicate a purposeful or bad faith failure to answer. *See Tex. Sting, Ltd.*, 82 S.W.3d at 650 (noting that the absence of a purposeful or bad faith failure to answer is the controlling factor under the first prong of *Craddock*).

We recognize that the trial court is to determine credibility and that we cannot substitute our opinion for the trial court's when there is evidentiary support for the trial court's conclusion. *See Jackson v. Mares*, 802 S.W.2d 48, 49 (Tex.App.-Corpus Christi 1990, writ denied). In the instant case, however, there is no evidence to controvert Schwartz's testimony that he never opened the e-mails or attachments with the Hood and Old South petitions, and thus there is no evidence that he was aware of these petitions or consciously indifferent of the need to answer these suits.

Hood and Old South contend St. Paul acted with conscious indifference because a person of reasonable sensibilities under the same or similar circumstances would have taken some action to inquire about whether Hood and Old South were proceeding with litigation in Texas. The same or similar circumstances from which St. Paul's conduct must be judged includes the "tunnel vision" mind set that Schwartz developed in light of the Mississippi litigation. In that regard, Schwartz's testimony

is uncontroverted that he assumed the subsequent suits sent to him were merely duplicates of the HICO suit. Further, looking at the Supreme Court's analysis in *Fidelity*, St. Paul explained precisely where the breakdown occurred. While tunnel vision is not a good excuse, it is some excuse. *See* 186 S.W.3d at 575–76.

**B. Meritorious Defense**

In order to satisfy the second prong of the *Craddock* test, the defaulting party must set up a meritorious defense by alleging facts, supported by affidavit, which in law would constitute a defense to the cause of action pled by the plaintiff. *Norton*, 935 S.W.2d at 902. A meritorious defense is one, that if ultimately proved, will cause a different result when the case is tried again. *Id. Craddock* requires that the defendant "set up" a meritorious defense, not that it prove one. *Id.* at 902–03. Once evidence of a meritorious defense is established, the allegations supporting it must be taken as true in spite of controverting evidence. *Id.* at 903. "[T]he trial court's decision is more limited with regard to the meritorious defense prong of *Craddock*." *Young*, 814 S.W.2d at 80. As noted, when the movant has set forth a meritorious defense supported by evidence, "such new trial should not be denied upon any consideration of counter affidavits or contradictory testimony offered in resistance to such motion." *Id.*

St. Paul relied upon the record from the Mississippi trial to set up numerous defenses. As to Hood, St. Paul claimed: (1) Hood was not a party to the Representation Agreement, so Hood has no standing as a shareholder of HICO to assert contractual claims; (2) even assuming Hood had standing, no breach of the Representative Agreement occurred; (3) negligent infliction of emotional distress is not a recognized cause of action and

Hood's testimony regarding his emotional distress does not rise to the severe level necessary to recover for intentional infliction of emotional distress; and (5) claims not previously alleged in the Mississippi litigation are barred by limitations. As to Old South, St. Paul set up the following defenses: (1) St. Paul had a right to tell clients that Old South's agent, Jerald Delaney, could no longer sell insurance policies for Titan/St. Paul; (2) the failure to give Delaney the thirty days notice that his license to write Titan policies was cancelled, as required by Mississippi law, does not give rise to civil liability, and any claim with regard to lack of notice only affected Delaney individually not Old South as an entity; (3) numerous clients that Old South claimed to have lost voluntarily elected to stay with St. Paul/Titan insurance; and (4) limitations barred any claims not previously alleged in the Mississippi litigation.

Hood and Old South seek to discount the evidence and argument used to support these defenses; however, the trial court was not permitted to consider the contradictory evidence. *Norton*, 935 S.W.2d at 903. The primary argument advanced by Hood and Old South is that the jury found in their favor; however, because the trial court could not consider contradictory evidence, we do not consider all of the evidence presented to the Mississippi jury. While the jury rejected St. Paul's defenses in the Mississippi litigation, that factor is of no consequence under the *Craddock* analysis of St. Paul's duty to set up a meritorious defense.

**C. No Delay or Prejudice**

 In order to satisfy the third prong of *Craddock*, the defaulting party must establish that the granting of its motion for new trial would not occasion a delay or otherwise work an injury to the plaintiff. *Id.* Important factors to consider in determining whether delay or injury will occur are: (1) whether the defendant has offered to reimburse the plaintiff for the costs involved in obtaining the default judgment; and (2) whether the defendant is ready, willing, and able to go to trial. *Id.* Once a defendant has tendered prima facie evidence that the granting of a new trial will not delay or otherwise injure the plaintiff, the burden shifts to the plaintiff to show proof of injury. *Id.* Schwartz and others testified that St. Paul would pay costs and was ready, willing, and able to go to trial. This prong of *Craddock* was satisfied.

CONCLUSION

Because St. Paul established all three prongs of the *Craddock* test, it is entitled to a new trial. In light of our ruling on this issue, we need not address St. Paul's remaining issues. *See* TEX.R.APP. P. 47.1 (directing courts of appeals to issue written opinions addressing issues necessary to final disposition of the appeal); *Long John Silver's Inc. v. Martinez*, 850 S.W.2d 773, 777 (Tex.App.-San Antonio 1993, writ dism'd w.o.j.) (noting that granting of new trial has legal effect of returning case to the docket as if there had been no previous trial or hearing). Accordingly, we reverse the default judgments and remand the causes to the trial court for further proceedings.

Dissenting Opinion by ALMA L. LÓPEZ, Chief Justice.

ALMA L. LÓPEZ, Chief Judge, dissenting.

While acknowledging that the trial court is to determine a witness's credibility, the majority states that we are required to judge the actions taken by St. Paul from Schwartz's "tunnel vision" mind set. In doing so, the majority necessarily substi-

tutes its judgment for that of the trial court in determining that Schwartz's testimony was credible despite evidence being presented that: (1) Schwartz received the three separate petitions with different styles and cause numbers by three separate e-mails with different subject lines containing each of the plaintiffs' names; (2) Schwartz received a second set of the petitions by e-mail a few days later; (3) HICO and Old South were represented by two different attorneys; and (4) Titan's general counsel and other St. Paul employees recognized that there were three separate lawsuits. Even if this evidence does not directly controvert Schwartz's testimony, it calls his credibility into question. Furthermore, because subjective state of mind can be proven by circumstantial evidence, I question the need for evidence directly controverting Schwartz's testimony. *See Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998); *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994).

This court has joined countless other courts in defining conscious indifference as follows:

> Conscious indifference is generally defined as the failure to take some action that would seem obvious to a reasonable person under similar circumstances.

*Texas Sting, Ltd. v. R.B. Foods, Inc.,* 82 S.W.3d 644, 650 (Tex.App.-San Antonio 2002, pet. denied). I believe the trial court was required to look at the circumstances as a whole, including the entire history of the litigation in Mississippi, to determine what action would seem obvious to a reasonable person. Given those circumstances, I do not believe the trial judge abused his discretion in finding that a reasonable person would have asked, "What happened to the other two plaintiffs who had been awarded millions of dollars by a Mississippi jury?" particularly given the on-going correspondence between the parties regarding the HICO lawsuit and the cost of the Mississippi litigation. Because the majority holds that the trial court abused its discretion in denying St. Paul's motion for new trial, I respectfully dissent.